# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 22, 2015

## STATE OF TENNESSEE v. MARK A. CRITES

**Appeal from the Circuit Court for Williamson County**
**No. IICR0161122     James G. Martin, III, Judge**

_____

**No. M2014-00383-CCA-R3-CD – Filed June 4, 2015**

_____

The defendant, Mark A. Crites, was convicted of aggravated robbery, a Class C felony. On appeal, he argues that the evidence is insufficient to sustain his conviction, that he was denied his right to a speedy trial, and that the trial court erred in restricting cross-examination of the victim. After reviewing the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Sandra L. Wells, Franklin, Tennessee, for the appellant, Mark A. Crites.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Kim Helper, District Attorney General; and Kelly Lawrence, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# FACTS AND PROCEDURAL HISTORY

This case arose after the defendant threatened the victim with a hammer and stole his cell phone. The victim and the defendant resided in the same trailer park. The victim lived on Lot 21, and the defendant lived across the street on Lot 26. On the morning of the incident, the victim testified that he was in his yard with his friend Jorge. The defendant entered the yard wielding a red metal hammer. He advanced on the victim, striking the hammer against the road and the yard before swinging it at the victim. He was cursing and shouting at the victim, demanding the victim's money. The defendant was saying, "M*********er, I'm going to kill you." The victim did not hear the defendant say anything about a sexual assault. To the victim, the defendant appeared as though he had been using drugs.

As the defendant advanced, the victim began to back away from him. The victim was "very scared," as the defendant appeared to be "a very desperate person." The victim attempted to mollify the defendant by offering to give him five dollars. The defendant refused, instead demanding "everything" that the victim had.

Once the defendant "let his guard down," the victim was able to run to his truck. The defendant was standing beside the truck, and the victim did not immediately drive away because he was afraid that he would run over the defendant. He rolled down the driver's side window in a final effort to talk to the defendant and to calm him down. He attempted to assuage the defendant's anger because he feared for his own life and he feared that the defendant might damage the truck, which had been loaned to the victim. The victim removed his cell phone from his pocket and placed it in his lap. The defendant raised the hammer above his head, reached into the truck, and grabbed the cell phone from the victim's lap. The victim then drove away from the trailer park and went to a nearby convenience store, where he called 911.

Several police officers from the Franklin City Police Department responded to the call. Officer Nick Grandy arrived at the scene, and he testified that the victim had been identified as "Miguel Lopez." He spoke with the victim, and the victim directed him to a trailer on Lot 26. Officer Grandy entered the trailer, and the defendant was not present. Officer Grandy saw the defendant's name on the living room wall, and he found a prescription pill bottle with the defendant's name and the address for Lot 26. He also saw a "red claw hammer with a black rubber grip" in the kitchen.

Detective Andrew Green also arrived at the scene. He spoke with the victim, who told him that his neighbor had approached him while holding a red hammer, demanded his money, and reached into his truck and stole his cell phone. The victim was not able identify his neighbor by name at the scene, but he provided a detailed description of his neighbor, including his numerous tattoos, to Detective Green. Officers were later able to

identify the defendant as the man from the victim's description. At trial, Detective Green identified the victim in the courtroom as the same person that he spoke with on the day of the incident.

Detective Green went to the trailer on Lot 26 and spoke with Officer Gandy. While in the trailer, he too saw a red hammer lying on the kitchen countertop.

The following day, Officer Sam Greer was dispatched to the trailer park after receiving a call regarding the victim's cell phone. He spoke with Pam Sweeny, the defendant's sister, who gave him a cell phone that she said did not belong to her. She was given the phone by her son, the defendant's nephew, who told Officer Greer that the phone was located "inside the first trailer on the left" of the trailer park. The defendant's nephew had retrieved the phone after the defendant told him of its location. Ms. Sweeny told Officer Greer that the "robbery scenario" reported by the victim was inaccurate and that the defendant had informed her that the incident involved the defendant's attempt to confront the men who allegedly sexually assaulted his girlfriend. The victim later verified that the cell phone given to Officer Greer was his.

Officer Greer informed Detective Green that he had obtained the defendant's cell phone number, and Detective Green called the number. The defendant answered, but he identified himself as "Dustin Hampton." The defendant, as Dustin Hampton, told Detective Green that the defendant had not robbed anyone and did not own a hammer. He claimed that the victim was lying about the robbery and that the incident was a result of a sexual assault against his girlfriend.[1]

The defendant was arrested the next day, and Detective Green recognized the defendant's voice from their phone conversation. The defendant admitted that he had been the person speaking to Detective Green and said that he gave a false name because he was afraid of being arrested. After waiving his *Miranda* rights, the defendant gave a statement, which set forth several different versions of the incident.

He said that his girlfriend informed him that she was sexually assaulted by several Hispanic males either late Friday evening or early Saturday morning. She informed him about the sexual assault on Saturday, and she also told him that she was pregnant with his child. The next day, the defendant saw the alleged rapists in the parking lot of the trailer park, and he went to confront them. He recalled that there were two to four Hispanic men in the parking lot.

The defendant told Detective Green that he did not have a hammer or any other weapons at the time of the confrontation. He approached the man later identified as the

---

[1] The defendant's girlfriend testified at trial, and her testimony included an allegation of sexual assault. In order to protect the privacy of the witness, we do not refer to her by name.

victim and hit him in the face, repeatedly asking, "[W]ho raped my woman?" After the defendant struck the victim, the victim dropped his cell phone, and he and another individual ran away. The defendant then picked up the cell phone from the ground.

The defendant told Detective Green that he worked in construction, and he denied owning a hammer. Later in the conversation, he told Detective Green that he built the porch and railing alongside his trailer. He admitted that he used a hammer for the construction, but he said that he did not know where the hammer was and believed that it had disappeared. He suggested that the Hispanic males had stolen his hammer from his trailer and later returned and placed the hammer on the kitchen counter. When asked if he was in possession of any other tools, the defendant admitted that he had a "red-handled adjustable wrench" in his back pocket when he confronted the men. He claimed that he never removed the wrench from his pocket, and he was not sure how the men would have seen the wrench in his back pocket. He later stated that he could have had a stick in his hand during the confrontation. He said that he did not hit the men with the stick.

In his statement, the defendant admitted to Detective Green that he did not contact the police about the alleged assault of his girlfriend; however, he said that he encouraged her to file a report. He told Detective Green that his girlfriend had informed him that she was pregnant with his child and that he attacked the males because they had assaulted his girlfriend while she was carrying his child.

Detective Green also spoke with the defendant's girlfriend and encouraged her to report the crime. He testified that she told him that the men dragged her from her car into the trailer. She clarified that she was not physically dragged but that the men opened her car door and kept telling her to come inside their trailer. Feeling uneasy, she permitted the men to lead her into the trailer, and she drank a beer with them. She did not remember finishing the beer, as she lost consciousness. When she awoke on Saturday, she did not recall anything that happened after she started to drink a beer. She noticed that her dress was torn on the side, and she felt pain in her rectal region. She told Detective Green that she was not sure if she was assaulted by any of the men. Detective Green did not believe that her statement corroborated the claims of the defendant because he spoke with her after speaking with the defendant and because she never filed an official police report.

The defendant's girlfriend testified that she went to the trailer park on the weekend of the incident to visit friends who lived across from the defendant. She was talking to Carlos, a friend who lived in the victim's trailer, and he and several others persuaded her to come into their trailer. They offered her a beer, and she started to drink it. She did not remember what happened "after drinking a beer or two." When she awoke the next morning, her clothes were off, and she believed that she had been raped. That evening, she told the defendant about the incident. The defendant was "a really good friend" who

4

was upset that she was attacked.  The defendant urged her to report the rape to police. She explained that she did not report the allegation because she had been the victim of a sexual assault when she was younger and did not want to be subjected to another rape trial.

The defendant stayed Saturday night with his girlfriend.  She dropped him off at his trailer around 6:30 a.m. Sunday morning, and they made plans to go to Nashville later in the day.  She returned to the trailer park around 12:15 or 12:30 p.m. to pick the defendant up, and she parked next to his trailer.  The defendant exited the trailer to take the trash out, and his girlfriend saw him start to walk across the road to the trailer where her alleged rapists resided.  She became "worried" and "scared" because she "didn't want any problems."

She drove to the end of the trailer park to wait for the defendant to return.  She saw two Hispanic males standing outside of Lot 21.  She recognized one of the men as Carlos, and she recognized the other man but could not recall his name.  She testified that the second man was not the victim.  She did not recall the defendant's having a hammer in his hands when he walked toward Lot 21.  Several minutes later, the defendant returned and got into her vehicle.

The defendant's girlfriend testified on cross-examination that she "wasn't in the situation to actually see that anything occurred" between the defendant and the males on Lot 21.  She agreed that she could not testify with certainty whether the victim was present at the scene of the confrontation, but after seeing the victim in court, she did "not recall him being there" at the scene.  She agreed that after his arrest, the defendant continued to press her to file a police report regarding the sexual assault.  She felt somewhat threatened by the situation, and she was particularly unnerved by a comment from the defendant's family members that her house would be burned down if she did not file a report.  She agreed that she was asked to provide the defendant with an alibi.

The defendant's second girlfriend testified that she was living with the defendant in the trailer on Lot 26.  She stated that the defendant had borrowed a hammer from his sister the evening before the incident to repair part of the floor.  She testified that the defendant exited the trailer to take the trash out and that he did not have anything in his hand. He returned to the trailer several minutes later, told her that he was leaving, and he exited the trailer.  A short time later, officers arrived at the trailer.

At the conclusion of the proof, the jury convicted the defendant of aggravated robbery as charged.  The trial court denied his motion for new trial, and he timely filed a notice of appeal.

# ANALYSIS

The defendant argues that the evidence is insufficient to support his conviction for aggravated robbery. He also contends that the third continuance of the trial violated his right to a speedy trial. Finally, he argues that the trial court erred in restricting his cross-examination of the victim.

## I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to establish all of the elements of aggravated robbery. He contends that there is no proof that he intended to deprive the victim of property because he only approached the victim to confront him about the alleged sexual assault of his girlfriend.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Tennessee Code Annotated section 39-13-401 (2010) defines robbery as "the intentional or knowing theft of property from the person of another by violence or by putting the person in fear." A robbery is aggravated when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1) (2010).

The defendant argues that the evidence is insufficient to sustain his conviction because it is "clear from the record" that the defendant's only intent in confronting the victim was "for the purpose of defending [his girlfriend's] honor." Viewing the evidence in the light most favorable to the State, the victim was in his yard on the morning of the

6

incident. The defendant approached him brandishing a red hammer and demanding the victim's money. Fearing for his life, the victim got into his truck, placed his cell phone on his lap, and was trying to safely leave the scene. Continuing to brandish the hammer, the defendant reached into the truck and snatched the victim's cell phone. Police were directed to a trailer where they discovered the defendant's name on the wall, prescription bottles in the defendant's name, and a red claw hammer. After initially denying that he owned a hammer, the defendant admitted that he used one for construction on his trailer. The defendant's second girlfriend also testified that the defendant had borrowed a hammer the evening before the incident. Police recovered a cell phone after being contacted by the defendant's sister, whose son was directed to the phone by the defendant. The victim later identified the phone as the one taken from him. We conclude that the evidence is sufficient to support the defendant's conviction. He is not entitled to any relief.

## II. Right to a Speedy Trial

The defendant argues that his right to a speedy trial was violated. Specifically, he contends that the State was on notice that the victim was at risk of being deported well before it filed a motion to continue the trial.

The grand jury indicted the defendant for aggravated robbery on January 9, 2012.

In April of 2012, the defendant filed a pro se motion for a speedy trial. The case was set for trial in June of 2012, but a conflict arose between the defendant and his first lawyer. The defendant filed a motion to discharge counsel, and counsel later filed a corresponding motion to withdraw on June 5, 2012. Because new counsel was appointed so close to the trial date, the defendant moved for a continuance. The trial was continued until December 21, 2012. Prior to the trial date, the trial court filed an order on November 29, 2012, dismissing the defendant's motion for a speedy trial as untimely because the defendant had several cases pending for trial that had been scheduled "as soon as administratively possible and has not been prejudiced by any delay." After it was learned that Detective Green had not received a subpoena in time to reschedule a training session and would be unavailable for that trial date, the defendant agreed to continue the trial until March 21, 2013.

The day before the March 21, 2013 trial date, the State filed a motion for a continuance as a result of an immigration issue with the victim. In the motion, the State argued that the victim was subpoenaed on December 20, 2012, to appear at trial and that the State verified that this subpoena was delivered. The motion alleged that at some point between December 2012 and January 2013, Detective Green visited the victim's last known address and confirmed that the victim was still living there and had received a subpoena to appear at trial. A week before the trial, the State attempted to contact the victim in preparation for trial. After attempts to reach the victim via telephone were

7

unsuccessful, investigators learned that his number was no long in service. Officers went to the victim's last known address, and they learned that the victim had been arrested in February of 2013 and had not returned since his arrest. Officers discovered that the victim may have been deported. Based upon that information, the State contacted the United States Immigration and Customs Enforcement ("ICE") agency. The State learned that ICE was holding the victim at a federal detention center in Louisiana. After speaking with an ICE agent, the State learned that the defendant was available for transport back to testify at the trial but that "circumstances beyond the State's control" prevented the victim from appearing on March 21, 2013.

In response to the State's motion, the defendant filed a motion to dismiss. At the hearing, the defense argued that the State was on notice in January that the victim had been deported. The victim was convicted on January 8, 2013, of driving on a suspended license. The order of conviction shows that the victim was to be placed on probation if in the United States and that there would be no probation if the victim was not in the United States. The defendant contended that the order should have made the State aware that deportation was a possibility. Trial counsel argued that she learned on February 25, 2013, that the victim had been deported and that she contacted the State to inform them. The State responded that it was "not sure at what point it is supposed to continually verify, un-verify hearsay or information regarding [its] potential witnesses." The State contended that it had taken sufficient steps by verifying the delivery of the subpoena and having Detective Green confirm that the victim still resided at his listed address.

The trial court granted the motion to continue and denied the motion to dismiss. The court found that there had been "considerable delay in this case" that was due in part to the defendant and in part to the State. The court found that the defendant requested a continuance after trial counsel was appointed and that the State requested a continuance because Detective Green had not received his subpoena in time to reschedule a training seminar. The court noted that the defendant agreed to this second continuance. The court found that while the defendant asserted his right to a speedy trial, he was a participant in two separate delays of the trial. The court also found that the defendant had not shown that he had suffered or would suffer any prejudice as a result of the third continuance. The defendant was ultimately tried on May 19, 2013.

Both the United States and the Tennessee constitution guarantee a defendant the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. This right is also legislatively guaranteed. T.C.A. § 40-14-101. The purpose of this right "is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997) (citing *Doggett v. United States*, 505 U.S. 647, 654 (1992). In order to determine whether this right was violated, courts should employ a four-factor "balancing test" that considers: "(1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted a claim to his right,

8

and (4) whether the defendant was prejudiced by the delay." *State v. Bishop*, 493 S.W.2d 81, 84 (Tenn. 1973) (citing *Barker v. Wingo,* 407 U.S. 514, 530 (1972)). A trial court's decision that the right to a speedy trial was not violated is reviewed for an abuse of discretion. *State v. Hudgins*, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing *State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996)).

We first consider the length of the delay. Courts need not consider the remaining *Barker* factors unless "there is some delay which is presumptively prejudicial." *State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001). Normally, the delay must approach one year to trigger the speedy trial inquiry. *Utley*, 956 S.W.2d at 494. The reasonableness of the delay is measured by "the complexity and nature of the case, but the presumption that delay has prejudiced the accused intensifies over time." *Simmons*, 54 S.W.3d at 759. Here, the defendant was tried sixteen months after he was originally indicted. As this delay was over one year, it is sufficient to necessitate an analysis of the remaining three factors. However, the delay of sixteen months is not unreasonable when compared to other cases. *See Simmons*, 54 S.W.3d at 759 (twenty-three month delay between indictment and prosecution "not necessarily unreasonable"); *Bishop*, 493 S.W.2d at 84 (stating that while a two-year delay was "a factor supporting a claim of a lack of a speedy trial," the length of the delay alone was insufficient to "support a finding that a defendant has been denied his right to a speedy trial").

The reason for the delay "generally falls into one of four categories: (1) intentional delay to gain a tactical advantage or to harass the defendant; (2) bureaucratic indifference or negligence, including overcrowded dockets or lack of diligence; (3) delay necessary to the fair and effective prosecution to the case, such as locating a missing witness; and (4) delay caused, or acquiesced, in by the defense, including good faith attempts to plea-bargain or repeated defense requests for continuances." *Simmons*, 54 S.W.3d at 759. The first two types of delay weigh against the State, although an intentional delay is weighed more heavily than a delay resulting from indifference or negligence. *State v. Wood*, 924 S.W.2d 342, 347 (Tenn. 1996). The third type "is, by definition, justifiable," and it is not weighed against either party. *Id.* The fourth type is weighed against the defendant because the defendant was either responsible for or agreed to the delay. *Id.*

There were several reasons for the delay in this case. The defendant requested the first continuance, and while the State was responsible for the second continuance, the defendant acquiesced to this continuance. Thus, the first two delays are weighed against the defendant. As to the third continuance, the trial court noted that both parties "acted diligently in this case in attempting to get it ready and prepared for trial." The delay was necessary to locate a missing witness. We do not believe that the slight delay resulting from the third continuance offsets the defendant's role in the previous two continuances. Therefore, this factor weighs against the defendant.

The assertion of the right to a speedy trial weighs heavily in favor of the defendant. *Simmons*, 54 S.W.3d at 760. Here, the defendant asserted this right when he filed a pro se motion requesting a speedy trial. However, the trial court found that this motion was untimely as the defendant had several pending trials that were scheduled as soon as administratively possible and that he had not shown any resulting prejudice. Furthermore, the defendant, after filing the motion, requested a continuance and then acquiesced in another. A failure to assert the right implies that the defendant does not actively seek a swift trial. *Wood*, 924 S.W.2d at 347. After failing to assert the right for the scheduled trials in June and December 2012, the defendant again asserted his right when the State discovered that the victim was unavailable to testify. Insofar as the defendant is challenging the nine-month delay prior to the postponement of the trial in March 2013, this factor weighs in favor of the State.

Whether the delay caused the defendant prejudice is the most important of the four factors. *Simmons*, 54 S.W.3d at 760. In determining whether prejudice exists, this court should consider that the right to a speedy trial is designed: "(1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation, and (3) to limit the possibilities that long delay impairs the ability of the accused to defend himself." *Bishop*, 493 S.W.2d at 85.

The defendant has not shown that he was prejudiced by the delay in his trial. He seems to rely on the second factor, stating in his brief that "[i]t would be reasonable that the possibility of serving a thirty-year sentence if convicted, weigh[ed] heavily on the defendant's mind especially when he is in the latter part of his years, has an aging parent as well as aging siblings," and he references a suicide attempt. At the time of the third continuance, the defendant was incarcerated as a result of several other unrelated charges awaiting trial, in addition to the charge of aggravated robbery. The defendant has not demonstrated that the delay caused him greater anxiety and concern than that normally associated with a pending felony prosecution, especially in light of the fact that the defendant was incarcerated at the time as a result of several other pending charges. *See State v. Berry*, 141 S.W.3d 549, 569 (Tenn. 2004) ("[A]ny allegation as to the anxiety and stress suffered from his incarceration during this delay is minimized by evidence that he was also incarcerated awaiting trial for two other crimes unrelated to the crimes involved here."). We conclude that the defendant's right to a speedy trial was not violated. He is not entitled to any relief.

### III. Cross-Examination of the Victim

The defendant argues that the trial court erred in restricting his cross-examination of the victim. Specifically, he contends that because his defense was that the victim was not who he claimed to be, the trial court should have permitted him to cross-examine the victim about his immigration status and his true identity. The State responds that this

issue is waived because the defendant failed to prepare an adequate record on appeal and in the alternative that the trial court did not err.

Prior to trial, the State filed a motion in limine to prevent the defense from questioning the victim about his immigration status. A written order from the trial court granting the motion is not in the record on appeal. However, on the morning of the trial, the trial court held a hearing on the motion, and this hearing is included in the transcript of the trial. The State argued that the questioning was prejudicial and irrelevant. The defense responded that the issue went to the veracity of the victim's character. The court found that cross-examination of the victim pursuant to Tennessee Rule of Evidence 609 would not be permissible unless there was evidence that the victim was convicted of a crime that resulted in a sentence of death or more than one year of imprisonment or was a crime involving dishonesty or false statements. The court found that unless the evidence showed that the victim was convicted of a crime falling within the ambit of Rule 609, his immigration status was not relevant. The court granted the State's motion but permitted the defendant to later renew the objection.

On direct examination, the State asked the victim why he purchased the trailer, and he responded that he planned to move his family into the trailer. On cross-examination, trial counsel asked the victim where his family was from. The State objected, arguing that the line of questioning was close to the issue of the victim's immigration status, which the trial court had ruled was inadmissible. The trial court observed that it was unclear how the location of the victim's family was relevant and sustained the objection.

In our analysis, we first address the issue of waiver. The State contends that the record does not include the trial court's order granting the State's motion to restrict cross-examination of the victim regarding his immigration status. The State is correct that "[w]here the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993). However, it appears that the written order is not in the record because the trial court only addressed the issue on the morning of trial and made an oral ruling instead of a written order. The transcript of the oral motion in limine and the trial court's ruling are contained in the record. Therefore, we conclude that the defendant has prepared a sufficient record for our review, and we will address the issue on the merits.

The Sixth Amendment to the United States Constitution affords a defendant the right to confront adverse witnesses. U.S. Const. amend. VI; *see also* Tenn. Const. art. I, § 9. This includes "the right to establish bias or to otherwise impeach the credibility of a witness." *State v. Echols*, 382 S.W.3d 266, 284-85 (Tenn. 2012) (citations omitted). The trial court possesses discretion over the propriety, scope, manner, and control of the

11

examination of a witness. *State v. Harris*, 839 S.W.2d 54, 72 (Tenn. 1992). The trial court abuses this discretion only "by unreasonably restricting a defendant's right to cross-examine a witness against him." *Echols*, 382 S.W.3d at 285.

In order to be admissible, evidence must first be relevant. Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. A trial court's decision regarding the admissibility of evidence is reviewed under an abuse of discretion standard. *State v. Kiser*, 284 S.W.3d 227, 262 (Tenn. 2009).

The defendant does not argue that the evidence of the victim's immigration status should have been admitted pursuant to Tennessee Rule of Evidence. Instead, he argues only that the victim's immigration status should have been admitted because his defense was that the victim was not who he claimed to be. The question of whether the victim was legally in the country had no relevance in establishing whether he was the victim of an aggravated robbery. When the victim responded that he built the trailer intending to move his family into it, it did not "open the door" to further questioning about his immigration status because his country of origin was not relevant to the issues at trial. Further, the identity of the victim was not a relevant issue at trial. Officer Gandy identified the victim as "Miguel Lopez," and Detective Green identified the victim in the courtroom as the individual that he spoke with on the day of the incident. The defendant was permitted to ask the victim on cross-examination if he had ever used a different name to identify himself, and his girlfriend testified for the defense that the victim was not one of the men whom the defendant confronted. To any extent that the victim's identity was in question, the defendant received a sufficient opportunity to address the issue. We conclude that the trial court did not abuse its discretion in limiting the cross-examination of the victim. The defendant is not entitled to any relief.

## CONCLUSION

Based upon the foregoing, we affirm the judgment of the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE

12